**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAMAICA HAMPTON,

        Plaintiff - Appellee,

 v.

CHRISTOPHER FLORES, in his
individual capacity as a police officer for
the City and County of San Francisco,

        Defendant - Appellant.

No.   25-752

D.C. No.
3:21-cv-09407-SK
Northern District of California,
San Francisco

MEMORANDUM*

Appeal from the United States District Court
for the Northern District of California
Sallie Kim, District Judge, Presiding

Argued and Submitted November 20, 2025
San Francisco, California

Before:  S.R. THOMAS, BRESS, and MENDOZA Circuit Judges.
         Dissent by Judge BRESS.

   Plaintiff-Appellee, Jamaica Hampton, sued Defendant-Appellant,

Christopher Flores, for damages under 42 U.S.C. § 1983 alleging that Flores

---

     *     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

violated the Fourth Amendment's prohibition on excessive force when he shot Hampton. U.S. Const. amend. IV. Flores brings this interlocutory appeal following the district court's denial of his motion for summary judgment based on qualified immunity. We affirm.

We review the district court's denial of summary judgment based on qualified immunity de novo. *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc). We consider all disputed facts in the light most favorable to Hampton, the non-moving party, unless the videotape contradicts them. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Because the parties are familiar with the facts of this case, we need not recount them here.

I

We have jurisdiction over this case under 28 U.S.C. § 1291 because denying summary judgment based on qualified immunity is an "appealable 'final decision'" so long as it "turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Flores raises two legal issues: one, that his actions were reasonable under the Fourth Amendment; and two, that even if unconstitutional, the unlawfulness of his actions was not clearly established. Appellate jurisdiction is appropriate for these two legal issues. *See, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 772-73 (2014)

2

(holding appellate jurisdiction is proper where the appellant raises legal issues rather than a pure factual challenge).

## II

To determine whether officers are entitled to qualified immunity under 42 U.S.C. § 1983 we use a "two-step test: first, we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question." *Mattos*, 661 F.3d at 440. We address each step in turn.

## A

Evaluating excessive force under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). We analyze whether force is excessive under the Fourth Amendment using three steps. *See Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011). We start by assessing "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Even

3

where some force is justified, the amount actually used may be excessive." *Id.* (internal quotations and citations omitted). Then, "we evaluate the government's interest in the use of force. Finally, we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal quotations and citations omitted).

The first step requires us to consider "the quantum of force used" when Flores fired his gun at Hampton. *Id.* Flores concedes that a gunshot is deadly force as it "creates a substantial risk of causing death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (en banc). The severity of the "intrusiveness of a seizure by means of deadly force is unmatched," *Tennessee v. Garner*, 471 U.S. 1, 9 (1985), so this factor weighs in favor of finding Flores's force was excessive.

The immediacy of the threat that Hampton posed to Flores and others, which is "most important *Graham* factor," dictates our conclusion at the second step. *Mattos*, 661 F.3d at 441 (internal quotation marks omitted). A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Id.* at 441-42. Objective factors do not justify a concern in this case because at the time Flores shot Hampton, he was unarmed, injured, and unable to get off the ground.

4

Hampton had previously presented a threat to officer and public safety at the time Officer Hayes fired six shots. However, Flores did not reassess the threat Hampton posed after Flores's partner, Officer Hayes, fired a round of six gunshots five seconds prior to Flores's single shot. *See Est. of Hernandez v. City of Los Angeles*, 139 F.4th 790, 795 (9th Cir. 2025) (en banc) (holding officers are required to reassess "the need for lethal force" after a suspect is shot and wounded). When he heard Flores's additional gunshot, Officer Hayes yelled "Stop!" twelve times as he had determined that Hampton no longer posed a threat after his six shots, and had begun calling for medical assistance. *See Kisela v. Hughes*, 584 U.S. 100, 101-02 (2018) (noting that all three other officers on the scene drew their guns and "subjectively believed" the plaintiff to be a threat to others when the defendant shot her).

In addition to the video showing Hampton wounded and unable to get off the ground, Flores's lack of reassessment, and Officer Hayes's subjective assessment of threat, would permit a reasonable jury to find that Hampton did not pose an immediate threat at the time Flores shot him.

Having determined both that the intrusion was most severe and that a reasonable jury could find Hampton did not pose an immediate threat, the final

5

balancing step under *Glenn* leads us to conclude that Flores's use of force was not reasonable under the Fourth Amendment as a matter of law. 673 F.3d at 873.

B

In determining whether Flores violated a clearly established constitutional right, "the focus is on whether the officer had fair notice that [his] conduct was unlawful," and this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Use of excessive force is an area of law often 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104 (2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). For "excessive force cases, we need to compare the specific facts of the case before us with the specific facts of previously decided cases," but the facts do not need to be "identical, or nearly identical to previously decided cases." *Johnson v. Myers*, 129 F.4th 1189, 1195 (9th Cir. 2025). Instead, we require "facts that are sufficiently similar to allow for a meaningful comparison." *Id*.

Considering the specific factual context of this case, we look to whether an individual's constitutional right to be free from additional deadly force where they had previously attacked and injured an officer with something other than a firearm,

6

but were unarmed, wounded, and unable to get off the ground from a prior round of gunshots at the time the officer fired a subsequent shot was clearly established. We conclude precedent exists that is "clear enough that every reasonable official would interpret it to establish the particular rule" that controls the facts in this case. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

In *Zion v. County of Orange*, we stated that where "the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting. This is particularly true when the suspect wields a knife rather than a firearm." 874 F.3d 1072, 1076 (9th Cir. 2017) (internal citation omitted). The officer in *Zion* fired a second volley of nine gunshots and curb stomped the plaintiff's head three times after he was already on the ground, wounded from the first round of gunshots six seconds prior. *Id*. at 1075. Flores argues this case is distinguishable from *Zion* because he fired the additional gunshot five seconds after Officer Hayes's first round and that he fired one shot rather than nine.

Hampton's fall to the ground constituted a break in the chain of events providing Flores an opportunity to reassess, so we again reject any strict time distinction. *See Hernandez*, 139 F.4th at 797, 801 (holding an officer had an opportunity to reassess when the break was 1.4 seconds). And while we have long

7

held that the distinction between deadly and non-deadly force is meaningful, *see*, *e.g., City of Hemet*, 394 F.3d at 704-07, the same cannot be said for Flores's proposed distinction between nine gunshots and one. In both instances, the officer's actions constituted the most severe intrusion on an individual's fundamental interest in their life. *Garner*, 471 U.S. at 9.

Additional sufficiently similar cases support to our conclusion that Flores shooting Hampton when he was unarmed, wounded, but had previously injured the officers with something other than a gun violated Hampton's clearly established constitutional rights. *See, e.g., Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir. 1992) (holding the officer's firing four additional shots at an "unarmed, wounded civilian" was not reasonable as a matter of law); *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1001-02 (9th Cir. 2020) (denying qualified immunity where an officer fired one additional shot at an individual who had previously injured the officer with scissors but did not continue to pose a threat after the first volley of shots).

**AFFIRMED.**

*Hampton v. Flores*, No. 25-752

BRESS, Circuit Judge, dissenting:

After Jamaica Hampton violently attacked San Francisco Police Officers Sterling Hayes and Christopher Flores, Officer Hayes fired his weapon at Hampton, causing Hampton to briefly fall to the ground. It is undisputed that Hayes's use of deadly force was justified. Just seconds later, when Hampton started to stand up, Flores fired a single additional shot to further subdue him. The majority concludes that Flores's single shot violated clearly established law, but it bases this determination on an incomplete understanding of the facts and a misapplication of Supreme Court precedent. I would hold that Officer Flores is entitled to qualified immunity.

I

The result in excessive force cases "depends very much on the facts of each case," which is why "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation omitted). In a case like this one, where we have a clear video portraying the encounter from start to finish, we "view the facts in the light depicted by the videotape." *Smith v. Agdeppa*, 81 F.4th 994, 997 (9th Cir. 2023) (alteration omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

1

In excessive force cases, we consider "[a]ll of the facts and circumstances from the beginning of the encounter." *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1118 (9th Cir. 2005); *see also Barnes v. Felix*, 605 U.S. 73, 76 (2025) (rejecting a "moment-of-threat rule" that "looks only to the circumstances existing at the precise time an officer perceived the threat inducing him to shoot"). Here, the encounter began when Hampton attacked the officers in their police car without provocation and in broad daylight as people in the neighborhood began to go about their day. Hampton struck Officer Flores in the head multiple times with a glass bottle, knocking his baton out of his hand and causing him to sustain a concussion. Then, when Officer Flores fled, Hampton pursued him. The officers ordered Hampton to "Get on the ground!" multiple times, with their guns drawn. But Hampton ignored those warnings and then charged at Officer Hayes, leading Hayes to fire six shots to protect himself and Flores from Hampton's violent assault.

As for the circumstances at the moment Flores shot Hampton, the majority's characterization leaves out the critical facts and materially understates the threat that Flores (and Hayes) faced. Three times, the majority says that Hampton was "unable to get off the ground" "at the time" of Flores's shot. However, the video plainly shows Hampton *starting to stand up* at the time Flores fired his shot—just seconds after Hayes's volley caused him to fall to the ground. As the district court accurately described it, Hampton at this point moved into a "kneeling lunge position." Then

2

Flores fired his shot, and Hampton fell back to the ground. The majority's characterization of Hampton as "unable to get off the ground" would describe Hampton at some point *after* Flores's shot—but it ignores Hampton's clear attempt to stand which *led to* that shot. This is not a case where the video is ambiguous and Hampton's movement is susceptible to multiple interpretations. The parties do not dispute that Hampton was attempting to stand up when Flores fired his shot, the district court acknowledged as much, and this key fact was the central basis for Hampton's appeal. Yet the majority completely fails to address this defining feature of the encounter or the impact it has on the clearly-established-law analysis.

II

At minimum, the fact that Hampton was starting to get up following his violent assault on the officers puts this case firmly outside the realm of clearly established law. The majority concludes that *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), clearly established the illegality of Flores's shot. But in *Zion*, we emphasized that "[i]n the video, Zion shows no signs of getting up." 874 F.3d at 1076. Here, by contrast, it is undisputed that Hampton *was* getting up, and not in some limited way, either. That fact alone makes this case "materially distinguishable" from *Zion*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021), such that denying qualified immunity is clear legal error.

3

Our recent en banc decision in *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) (en banc), confirms this interpretation of *Zion*. In *Hernandez*, we characterized *Zion* as holding that "when an officer shoots and wounds a suspect, and he falls to the ground, the officer cannot continue to shoot him, *absent some indication that he presents a continuing threat*." *Hernandez*, 139 F.4th at 795 (emphasis added). Put differently, *Zion*, per *Hernandez*, established that "a fallen and injured suspect armed only with a bladed instrument does not present a continuing threat merely because he makes nonthreatening movements on the ground *without attempting to get up*." *Id.* (emphasis added). *Zion* thus stands only for the proposition that it is "clearly established that continuing to shoot a suspect who appears *incapacitated* violates the Fourth Amendment." *Id.* at 802 (emphasis added).

If that language were not clear enough, the *Hernandez* court's application of *Zion* erases any doubt on this point. In *Hernandez*, there were three volleys of shots. After the officer's first volley, Hernandez "fell to the ground on his right side." *Id.* at 796. Then, Hernandez "rolled to the left into a position with his knees, feet, and hands on the pavement, facing down, and started to push himself up, though he did not continue walking toward" the officer. *Id.* The officer fired a second volley, which "caused [Hernandez] to fall onto his back and curl up into a ball with his knees

4

against his chest and his arms wrapped around them." *Id.* at 796–97. The officer then fired a third volley. *Id.* at 797.

It was the third volley that divided the en banc court under *Zion*. But it is the second volley in *Hernandez* that bears many similarities to Flores's shot here. In both cases, initial shots felled a suspect. *Id.* at 796. When the suspect "started to push himself up" a few seconds later, the officer fired a second volley, causing the suspect to fall back to the ground. *Id.* at 796–77. In *Hernandez*, applying *Zion*, all eleven members of the en banc court agreed that the officer's second volley was reasonable as a matter of law. *Id.* at 800. We based that conclusion on the fact that Hernandez "had risen halfway to a standing position" and thus "was not yet incapacitated." *Id.* It was this critical distinction—whether Hernandez was getting up or was "incapacitated"—that distinguished the second (constitutional) volley from the third (unconstitutional) volley. Hampton here was plainly not incapacitated at the moment that Flores shot him. And if the second volley in *Hernandez* was reasonable as a matter of law under *Zion*, I do not see how it could be *clearly established* that the second volley here was *unconstitutional* under that same authority.

There are of course some differences between this case and *Hernandez*, but they cut both ways. The time between the first and second volleys in *Hernandez* was shorter than what we have here, but just by a matter of seconds. The suspect in

5

*Hernandez* did have a blade, but he was also 36 feet away from the officer who shot him, so he was not in immediate striking distance. *Id.* at 796. As the video reflects, the two officers here were much closer to Hampton. And Hampton, unlike Hernandez, had already violently attacked officers. But again, my broader point is that if the second volley in *Hernandez* was constitutional, it cannot be said that the asserted unconstitutionality of Flores's single shot was clearly established.

The majority, for its part, makes no attempt to reconcile its holding with *Hernandez* and its binding interpretation of *Zion*. Instead, the majority claims that *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) and *Tan Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020) are "sufficiently similar" to "support" its conclusion. But those cases involved very different fact patterns, where officers had much more time to reassess the threat. *See Hopkins*, 958 F.2d at 886 ("several minutes" passed between the first and second volleys); *Tan Lam*, 976 F.3d at 998 (officer "not only had time to speak to [the suspect's father], but also had time to clear his jammed handgun"). *Tan Lam* was also decided after the events in question here, so it cannot serve as clearly established law. *See, e.g.*, *Kisela v. Hughes*, 584 U.S. at 107 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist . . . .").

The Supreme Court has emphasized that courts should be especially wary of second-guessing officers' "split-second judgments." *Plumhoff v. Rickard*, 572 U.S.

765, 775 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). That concern is directly implicated in this case. And by ignoring the key differences between this case and *Zion* and our other precedents, the majority violates the Supreme Court's critical directive "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. at 104 (quotations omitted). It is an upside-down world when Hampton violently attacked officers and put Officer Flores to a split-second decision affecting public safety, yet emerges from this episode with the potential for a monetary award.

I respectfully dissent from the decision to deny Officer Flores qualified immunity.